


FILED

Mar 28 2025, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Brent D. Mullis,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

March 28, 2025

Court of Appeals Case No.
24A-PC-1025

Appeal from the Bartholomew Circuit Court

The Honorable Kelly S. Benjamin, Judge

Trial Court Cause No.
03C01-2206-F5-2806
03C01-2309-PC-4649

---

**Opinion by Judge Pyle**
Judges May and Brown concur.

**Pyle, Judge.**

## Statement of the Case

Brent D. Mullis ("Mullis") was convicted of Level 5 felony burglary,[1] Class A misdemeanor theft,[2] and Class B misdemeanor criminal mischief[3] and was adjudicated to be an habitual offender.[4] The trial court sentenced Mullis to an aggregate sentence of twelve years. Mullis commenced a direct appeal but suspended it, pursuant to the *Davis/Hatton* procedure,[5] and filed a petition for post-conviction relief. In his post-conviction petition, he raised a claim of ineffective assistance of trial counsel. The post-conviction court denied Mullis' petition for post-conviction relief.

Mullis now raises three direct appeal issues and one post-conviction appeal issue. Specifically, he argues that: (1) the trial court committed fundamental

---

[1] IND. CODE § 35-43-2-1.

[2] I.C. § 35-43-4-2.

[3] I.C. § 35-43-1-2.

[4] I.C. § 35-50-2-8.

[5] As our Court has explained:

> The *Davis-Hatton* procedure results in the termination or suspension of an already initiated direct appeal to allow the appellant to pursue a petition for post-conviction relief. Where, as here, the petition for post-conviction relief is denied, the direct appeal may be reinstated. This procedure permits an appellant to simultaneously raise his direct-appeal issues as well as issues on appeal from the denial of his petition for post-conviction relief. In other words, the direct appeal and the appeal of the denial of post-conviction relief are consolidated.

*Hinkle v. State*, 97 N.E.3d 654, 658 n.1 (Ind. Ct. App. 2018) (internal citations and quotation marks omitted).

error when it admitted into evidence testimony from a witness relating to Mullis' identification; (2) there is insufficient evidence to support his burglary conviction; (3) his aggregate sentence is inappropriate; and (4) the post-conviction court erred by denying his petition for post-conviction relief. Concluding that: (1) Mullis has failed to show fundamental error; (2) there is sufficient evidence to support Mullis' conviction; (3) Mullis' aggregate sentence is not inappropriate; and (4) the post-conviction court did not err by denying Mullis' petition for post-conviction relief, we affirm the challenged judgments.

[3] We affirm.

## Issues

1. Whether the trial court committed fundamental error when it admitted testimony into evidence.

2. Whether there is sufficient evidence to support Mullis' burglary conviction.

3. Whether Mullis' sentence is inappropriate.

4. Whether the post-conviction court erred by denying Mullis' petition for post-conviction relief.

## Facts

[4] In 2007, in another cause, Mullis was convicted of two counts of Class C felony burglary, adjudicated to be an habitual offender, and sentenced to an aggregate term of twenty-eight (28) years executed in the Indiana Department of Correction ("DOC"). A few months before May 2022, Mullis was released on parole.

[5] In May 2022, Mullis attended counseling at Centerstone Health Services ("Centerstone"). Mullis lived with his mother ("Mullis' mother") in an apartment complex just down the street from the Centerstone building.

[6] Genoa Healthcare Pharmacy ("the pharmacy") rented office space within the Centerstone building, and it provided pharmacy services for patients of Centerstone. In May 2022, Rachael House ("House") was the pharmacy site manager.

[7] On May 31, 2022, around 5:45 a.m., the pharmacy's alarm monitoring company called House and left a voicemail to notify her that the pharmacy's alarm had been triggered. House did not hear the voicemail at that time. The pharmacy's alarm monitoring company also called the police to notify them of the triggered alarm.

[8] Around 5:48 a.m., the Columbus Police Department received a notification from dispatch regarding the alarm. A police officer went to the Centerstone building, walked around it, and checked for any signs of a break-in. The officer did not see any open or damaged doors. The officer was unable to go inside the building because dispatch had been unable to reach anyone who had keys for the building. The officer left the building around 6:00 a.m.

[9] Around 7:15 a.m., Kristie Petro ("Petro"), the practice manager for Centerstone, arrived to the Centerstone building for work. When Petro entered the building, she noticed that the door for Suite 200 was ajar, a wooden piece was missing from the top of the door, and there was glass that appeared

shattered near the door. As Petro exited the building to call the police, she noticed another set of doors that appeared to be ajar.

[10] Police officers arrived at the Centerstone building around 7:30 a.m. The officers did a sweep of the building and saw damage to the various parts of the building. For example, there were scratches to the inner portion of a set of metal exterior doors that led inside the building. There was also damage near Suite 200 inside the building, and this damage included chunks of concrete on the floor, a window that appeared as if someone had attempted to break it, and damage to the top of the door where a magnetic lock had been pried off. Additionally, the officers discovered damage to a latch mechanism of a door that led to an employee-only hallway leading to the pharmacy, damage to a latch mechanism of the pharmacy doorway, and an alarm monitor on the hallway floor.

[11] House arrived for work at the pharmacy around 7:30 a.m. and saw the police in the parking lot. She then realized that she had missed the call from the pharmacy's alarm monitoring company. The police let House into the building to go to the pharmacy. As House walked in the hallway toward the pharmacy, she saw that the pharmacy's alarm monitor, which had been located inside the pharmacy, had been ripped off the pharmacy wall and was on the hallway floor. Once inside the pharmacy, House saw that medications were missing from the shelves, medications on the counter had been moved and "obviously rooted through[,]" the locked cabinet and safe that held controlled substances had been pried open and some controlled substances had been removed, the

cash register had been opened and was missing money, and there were several medication bottles on the floor. (Trial Tr. Vol. 2 at 78). The medications that had been taken included both controlled and non-controlled substances. The controlled substances that had been stolen included 400-500 tablets of Alprazolam or Xanax in several strengths, a bottle of Methylphenidate, and a bottle of Promethazine with Codeine. The non-controlled substances stolen included bottles of Hydroxyzine, Hydralazine, Hydrochlorothiazide, and Omeprazole. House also found a screwdriver on the counter and a set of pliers near the computer. These tools did not belong to the pharmacy.

[12] That same day, the police obtained security surveillance videos from both the pharmacy and Centerstone. The pharmacy had cameras that "cover[ed] every inch of the pharmacy." (Trial Tr. Vol. 2 at 98). The police obtained seven videos from the pharmacy, and those videos were in black and white. The pharmacy's video footage showed a male suspect go into the pharmacy. The suspect was wearing gloves, shorts, a t-shirt, and tennis shoes with stripes on the side. The suspect's face is visible in the videos. At times, the suspect pulled the collar of his t-shirt up over his nose as if to attempt to cover his face. The video also showed the suspect, who had a flashlight, search the medication bottles on the pharmacy's shelves and then take certain bottles. The suspect pulled a plastic bag out of his pocket and placed the bottles in the bag. Additionally, the video showed the suspect place a pair of pliers on the countertop and then take money from the cash register. The suspect also took a

screwdriver out of his back pocket, pried open a locked cabinet, and took medication from it.

[13] The two videos that the police obtained from Centerstone were in color. Centerstone's video footage showed the same male suspect, who was wearing a gray t-shirt, blue jean shorts, and white tennis shoes. The videos showed the suspect, who was carrying a plastic bag, walking in the parking lot and towards a line of trees on the edge of the parking lot.

[14] Detective Tony Kummer ("Detective Kummer") took still photographs from the surveillance videos and emailed these photos of the suspect to law enforcement. The police then posted the photos of the suspect on social media. Thereafter, "multiple people[,] both within law enforcement [and] also [in] the general public[,]" provided Mullis' name as the person in the photographs. (Trial Tr. Vol. 2 at 235).

[15] Stephanie Nienaber ("Nienaber"), who was a front desk worker at Centerstone, was one of the people who had identified the suspect as Mullis. Nienaber saw the photographs on social media and believed that the suspect resembled Mullis, whom she had previously helped while he was at Centerstone. Nienaber had also seen Mullis' photograph in his Centerstone patient file. Nienaber then looked in Mullis' patient file, reviewed his patient photo and his driver's license photo that were in his file, and then notified Petro, who was her boss. Thereafter, Petro informed the police of Nienaber's belief that Mullis was the suspect in the police photos.

[16]     On the morning of June 1, Detective Kummer instructed Officer Frank Dickman ("Officer Dickman") to go to Mullis' apartment complex to see if the officer could make contact with Mullis, who had become a person of interest in the investigation. When Mullis appeared in the parking lot, Officer Dickman, who was wearing a body cam, spoke to Mullis. Officer Dickman recorded video and took photographs of Mullis. The officer then left Mullis, downloaded his body cam video and photographs, and provided them to Detective Kummer for his investigation. Detective Kummer compared the images of Mullis on the officer's body cam to the surveillance videos from Centerstone and the pharmacy, and he "believed that the subject in the pharmacy and . . . Mullis were the same person." (Trial Tr. Vol. 2 at 209).

[17]     Later that day, Detective Kummer obtained a search warrant for Mullis' apartment and for a DNA sample. When Detective Kummer and police officers went to Mullis' apartment, Mullis was there with his mother and another person. The police did not find anything of evidentiary value within Mullis' apartment. The police then searched the "public" or "communal" dumpster at Mullis' apartment complex, and they found a trash bag containing men's clothing that appeared to be consistent with the clothing worn by the suspect from the security videos. (Trial Tr. Vol. 2 at 174, 214). Specifically, the trash bag contained blue jean shorts, a gray t-shirt, and white tennis shoes with stripes on the side. Detective Kummer noted that the collar of the t-shirt was "bowed out[,]" and he believed that the collar seemed to be stretched from the "same motion [the suspect had made in the video] of trying to cover his face."

(Trial Tr. Vol. 2 at 215-16). Additionally, the trash bag contained two appointment cards from Centerstone that had Mullis' first name of "Brent" on them. The trash bag also contained an empty prescription bottle from the pharmacy, and that bottle had Mullis' mother's name on it.

[18] The State charged Mullis with Level 5 felony burglary, Level 6 felony theft, and Class B misdemeanor criminal mischief.[6] The State also alleged that Mullis was an habitual offender.

[19] After the police had arrested Mullis, they later seized his cellphone pursuant to a search warrant. Thereafter, the Indiana State Police Cyber Crimes Unit analyzed Mullis' cellphone. That analysis revealed that, in the week leading up to the burglary, Mullis had done Google searches on how to deactivate a business or DCS alarm and on how burglars disable alarms. The analysis also revealed that, on the day of the burglary, Mullis had done Google searches on medications that were the same medications that had been stolen from the pharmacy. Those medication searches occurred between 6:30 a.m. to around 1:00 p.m., which was after the time of the burglary. Additionally, the State sent the tennis shoes found in the trash bag and the screwdriver found in the pharmacy for DNA testing. A forensic scientist determined that Mullis' DNA

---

[6] The theft charge was enhanced to a Level 6 felony based on the allegation that Mullis had a prior burglary conviction.

matched the DNA on the tennis shoes and that there was an insufficient quantity of DNA on the screwdriver.

[20] The trial court held a three-day bifurcated jury trial in late February/early March 2023. Mullis was represented by appointed counsel, Joseph Villaneuva ("Trial Counsel"). Mullis' theory of defense was identification. During opening statements, Trial Counsel stated that there were no eyewitnesses who had seen Mullis commit the crimes and that the State would have to rely upon circumstantial evidence to prove identification.

[21] During the trial, the State introduced over one hundred exhibits, which included photographs of the damage done to the Centerstone building and the pharmacy, the surveillance videos from the pharmacy and Centerstone, the still photographs of the suspect taken from the pharmacy videos, the clothing and shoes found in the dumpster at Mullis' apartment, and Mullis' photograph and driver's license photograph that were in his Centerstone patient file. Additionally, the State Police forensic analyst testified that DNA testing of the tennis shoes from the trash bag showed that the tennis shoes contained DNA that matched Mullis, and the State admitted the DNA analysis report into evidence. Also, the State Police digital forensic examiner testified about Mullis' Google searches on medications and on how burglars disable an alarm, and the State admitted the printout of Mullis' Google searches.

[22] Nienaber, Officer Dickman, and Detective Kummer provided an in-court identification of Mullis. Specifically, Nienaber, who testified that she had

previously helped Mullis while at Centerstone and had seen Mullis' photograph in his Centerstone patient file, identified him in court. Nienaber also testified how she had seen the still photographs of the suspect on social media, believed that the suspect resembled Mullis, reviewed Mullis' patient photo and his driver's license photo in his file, and then ultimately notified the police of that identification belief. Mullis did not object to Nienaber's testimony. Additionally, Officer Dickman identified Mullis in court as the person whom he had encountered on June 1 in Mullis' apartment parking lot and had videoed and photographed. Lastly, Detective Kummer identified Mullis in court as the person he had seen in the surveillance videos, still photos, and in Officer Dickman's body cam video and photos. Following Detective Kummer's testimony, the jurors submitted questions for the detective. One juror asked Detective Kummer to give his "level of certainty" that the person in the surveillance videos was Mullis, and Detective Kummer responded, "One hundred percent." (Trial Tr. Vol. 2 at 235).

[23] Centerstone's director of facilities, Melissa Brown ("Brown"), testified about the location and operation of Centerstone's security cameras. Specifically, Brown testified about the type of equipment used for the security cameras, the location where the equipment was secured, the process of how the video footage was recorded and could be retrieved, and the accuracy of the timestamp on the videos.[7] When the State moved to admit Exhibits 69 and 70, the

---

[7] The timestamp on the videos was off by around twenty minutes.

surveillance videos from the exterior of the Centerstone building, Trial Counsel asked Brown some preliminary questions about the videos. Brown verified that the two videos that Centerstone had provided to the police had been retrieved directly from Centerstone's secured server system and had not been edited or altered. Trial Counsel then told the trial court that "[w]ith that, I can't have an objection." (Trial Tr. Vol. 2 at 137). The trial court then admitted the Centerstone surveillance videos into evidence.

[24] The pharmacy's director of operations, Aaron Knapp ("Knapp"), testified about the location and operation of the pharmacy's security system and security cameras. Specifically, Knapp explained that the pharmacy had seven security cameras that covered all parts of the pharmacy and that the system was monitored 24/7. Knapp also testified about the type of equipment used for the security cameras, the process of how the video footage was recorded and could be retrieved from an online portal, and the timestamp information on the videos. Additionally, Knapp testified that the videos that the pharmacy had provided to the police were accurate and had not been altered. The State offered Exhibits 55 through 61, the seven videos from the pharmacy, and the trial court admitted them into evidence without objection. Additionally, the State also admitted Exhibits 62 through 68, which were still photographs obtained from the pharmacy's surveillance videos. These photographs, which had timestamps between 5:43 a.m. and 6:01 a.m., showed the suspect inside the pharmacy as he walked through the pharmacy, searched the shelves, pried open a locked cabinet, took medications, and took cash from the cash register.

[25] The State also admitted photographs of the contents of the trash bag found in Mullis' apartment dumpster. Specifically, the photographs showed the gray t-shirt, blue jean shorts, white tennis shoes, two Centerstone business cards with the name Brent on them, and an empty prescription bottle, which came from the pharmacy and had Mullis' mother's name on it. Mullis did not object to the admission of this testimony. The State also admitted the t-shirt, shorts, and shoes into evidence without objection.

[26] The jury found Mullis guilty of Level 5 felony burglary, Class A misdemeanor theft, and Class B misdemeanor criminal mischief. After the jury entered their verdicts, the jury exited the courtroom before the trial court proceeded to phase two of the trial.

[27] Thereafter, Trial Counsel informed the trial court that Mullis was planning to admit to the theft enhancement and to the habitual offender allegation. When the trial court asked Mullis to raise his right hand, Mullis told the trial court, "I'm not doing that. I'm not raising my right hand; I'm not saying nothing else. . . . I think this is a bias court and you can kiss my ass[,] and I don't give a damn what you charge[.]" (Trial Tr. Vol. 3 at 79). The trial court found Mullis in contempt of court, and Mullis replied, "That's fine. Find me in contempt[.]" (Trial Tr. Vol. 3 at 79). The trial court warned Mullis to remain quiet or he would serve additional jail time, and Mullis told the trial judge, "You're a bias bitch and fuck you[.]" (Trial Tr. Vol. 3 at 80). The trial court ordered Mullis to serve 180 days in jail and ordered him to be removed from the courtroom. Mullis continued his outburst, calling the trial judge, "a fucking bitch" and

telling her to "give [him] another 180 days[.]" (Trial Tr. Vol. 3 at 81). As Mullis was removed from the courtroom, he yelled "good riddance bitch." (Trial Tr. Vol. 3 at 82). Mullis also told Trial Counsel that he had done "a good job" and that it was "hard to beat a stacked deck[.]" (Trial Tr. Vol. 3 at 82).

[28] The State informed the trial court that it no longer wished to proceed on the theft enhancement and would proceed only on the habitual offender allegation. The trial court then had the jury return to the courtroom for the habitual offender allegation phase of the trial. Following the presentation of evidence, the jury found Mullis to be an habitual offender. The trial court deferred entering judgments of conviction until the sentencing hearing.

[29] The presentence investigation report ("PSI"), which was completed in March 2023, revealed that then forty-nine-year-old Mullis had an extensive criminal history, including felony convictions, a misdemeanor conviction, and probation violations. Mullis' felony convictions included five burglary convictions and a theft conviction with executed time served in the DOC. Mullis also had a felony conviction for escape after he had escaped from the DOC, stole a truck, and fled to Georgia. Mullis had been sentenced on his two most recent felony burglary convictions in 2007, and he had been on parole from these burglary convictions at the time he committed the offenses at issue in this case. Additionally, Mullis had a lengthy juvenile history that spanned from age seven to age sixteen when he had been waived to adult court. His juvenile history included burglary, theft, robbery, intimidation, criminal conversion, and mischief. Additionally, the PSI revealed that Mullis had started using

methamphetamine when he was eighteen years old and had used it until the time of his arrest in 2022.

[30] During Mullis' sentencing hearing, the trial court gave Mullis an opportunity to make a statement of allocution. Mullis stated, "I'm not going to waste my time. I'm not begging for mercy. It's irrelevant and . . . I don't have nothing to say." (Trial Tr. Vol. 3 at 126). Thereafter, when the trial court was discussing aggravating and mitigating circumstances, Mullis engaged in an outburst and accused the trial court and the police of being unfair and biased. The trial court instructed Mullis to stop and warned him that he could be held in contempt of court. Mullis told the trial court, "I don't care what you do." (Trial Tr. Vol. 3 at 131). When the trial court told him that he would be held in contempt if he spoke again, Mullis retorted, "hold me in fifteen thousand contempt[s]" and continued his outburst. (Trial Tr. Vol. 3 at 131). The trial court found Mullis in contempt of court and ordered him to serve thirty (30) days in jail consecutively to his other contempt jail sentence. When the trial court warned Mullis that he could be removed from the courtroom if he did not stop his outburst, Mullis continued his outburst. The trial court then removed Mullis from the courtroom and continued with sentencing.

[31] The trial court found that there were no mitigating circumstances. The trial court found that aggravating circumstances included: (1) Mullis' extensive criminal history; (2) his previous probation violations; (3) the fact that Mullis was on parole at the time of his offenses; (4) his lack of remorse; (5) his disdain for the court, law enforcement, and the community; and (6) the nature and

circumstances of the offenses. The trial court noted that Mullis had burglarized the place where he had been receiving treatment and that the "gratitude he gave was by busting in the doors[.]" (Trial Tr. Vol. 3 at 134). Additionally, the trial court noted that Mullis had taken medicines from the pharmacy that other patients had needed and further resulted in the pharmacy "shutting down . . .for a period of time so that persons could not get [the] assistance or help that they needed." (Trial Tr. Vol. 3 at 134).

[32] The trial court entered the judgments of conviction and imposed a six (6) year sentence for Mullis' Level 5 felony burglary conviction, a one (1) year sentence for his Class A misdemeanor theft conviction, and a 180-day sentence for his Class B misdemeanor criminal mischief conviction. The trial court ordered these sentences to be served concurrent to one another. The trial court also enhanced Mullis' Level 5 felony conviction by six (6) years for his habitual offender adjudication. Therefore, the trial court imposed an aggregate sentence of twelve (12) years to be served in the DOC.[8]

[33] Mullis, while represented by appellate counsel, then commenced a direct appeal. While the appeal was pending, Mullis filed a *Davis/Hatton* petition, seeking to stay his appeal and to file a petition for post-conviction relief. Our Court granted his request to utilize the *Davis/Hatton* procedure and dismissed his appeal without prejudice.

---

[8] The trial court ordered that Mullis' aggregate sentence be served consecutively to his contempt sentences.

[34]    Thereafter, Mullis filed a pro se post-conviction petition, which he twice amended. In his final amended petition, Mullis raised a claim of ineffective assistance of trial counsel.[9] Mullis argued that Trial Counsel had rendered ineffective assistance when he failed to file or raise pretrial and trial challenges to the following State's evidence: (1) Centerstone's and the pharmacy's surveillance videos; (2) the shirt, shorts, and shoes found in the communal apartment dumpster; and (3) Nienaber's testimony. Specifically, Mullis asserted that Trial Counsel should have filed a motion to suppress and should have objected at trial to the surveillance videos because the State had failed to lay a proper foundation when "[t]here were no witnesses to authenticate that the individual in the video[s] was [Mullis.]" (App. Vol. 4 at 10). Mullis also argued that Trial Counsel should have filed a motion to exclude the shirt, shorts, and shoes because "no witness could testify as to why these items were in the dumpster, when they were placed there, and if they were the same exact items used in the commission" of the crimes. (App. Vol. 4 at 11). Lastly, Mullis asserted that Trial Counsel should have filed a motion to exclude and should have objected at trial to Nienaber's testimony because she "had no first-hand knowledge" or "personal knowledge" of the crimes and Mullis' identity. (App. Vol. 4 at 11-12).

---

[9] Mullis also raised a post-conviction claim that the prosecutor had violated his due process rights by calling Nienaber as a witness. Mullis does not raise an appellate challenge to that claim.

[35]     The post-conviction court held a hearing in February 2024. During the hearing, Mullis appeared pro se and called Detective Kummer and Trial Counsel as witnesses. Mullis asked Detective Kummer how he could have "possibly link[ed]" the shirt, shorts, and shoes that had been found in the trash bag in the communal dumpster of Mullis' apartment to Mullis. (Post-Conviction Tr. Vol. 2 at 11). Detective Kummer explained that, in addition to the clothing items, the trash bag also contained items with Mullis' name and Mullis' mother's name on them. Mullis had Detective Kummer confirm his trial testimony that he did not know if the trash bag had been placed in the dumpster before or after the burglary. Mullis then asked Detective Kummer if he was "sticking with the same story that the clothes were linked to [Mullis] via the burglary[,]" and Detective Kummer responded in the affirmative. (Post-Conviction Tr. Vol. 2 at 13). During cross-examination, Detective Kummer further explained that the items in the trash bag were connected to Mullis because Mullis' DNA was on the discarded shoes. Additionally, Detective Kummer confirmed that the shirt and pants from the trash bag matched what Mullis was wearing in the surveillance videos.

[36]     Mullis questioned Trial Counsel about why he had not filed pretrial motions, such as a motion to exclude or suppress, and why he had not objected to the surveillance videos, the clothing items found in the dumpster, and Nienaber's testimony. Trial Counsel testified that he had not filed a motion to suppress the surveillance videos because they had been "legally obtained by the State" when the police had gotten the videos from Centerstone and the pharmacy. (Post-

Conviction Tr. Vol. 2 at 32). Trial Counsel also testified that he did not object to the admission of the surveillance videos because "a sufficient foundation" for the videos had been laid. (Post-Conviction Tr. Vol. 2 at 23, 31, 41, 44). Trial Counsel specifically explained that the two witnesses, who represented Centerstone and the pharmacy, had provided the necessary foundation for the admission of the videos. Trial Counsel testified that the jury, who had had the opportunity to see Mullis in the courtroom and the opportunity to review the video, had made "a determination as to [the] question of fact" of whether Mullis had been the person in the video, determining that Mullis was that person. (Post-Conviction Tr. Vol. 2 at 45).

[37] Trial Counsel also testified that there had not been any basis to file a motion to exclude the clothing found in the dumpster because the clothing had been "found in a communal dumpster and pursuant to a lawfully executed search warrant[.]" (Post-Conviction Tr. Vol. 2 at 36). Trial Counsel explained to Mullis that his job, which he had done, was to "minimize the strength of that evidence" and to "put some kind of reasonable doubt in the jury's mind that the clothes could be another set of clothes that were similar" despite the fact that Mullis' DNA had been found on the shoes. (Post-Conviction Tr. Vol. 2 at 37).

[38] Mullis asked Trial Counsel why he had not objected to Nienaber being called as a witness when she had no personal knowledge of the crime. Trial Counsel explained to Mullis that Nienaber had not been called as an eyewitness to the crimes and that she had testified to Mullis' identification, which was a question of fact for the jury to ultimately decide. Trial Counsel testified that counsel's

job had been to cross-examine Nienaber and that "the basis of [counsel's] cross examination [had been] to challenge the credibility and strength of [Nienaber's] testimony." (Post-Conviction Tr. Vol. 2 at 24). Trial Counsel further explained to Mullis that Nienaber had been an employee of Centerstone and had had contact and personal interaction with Mullis and that her identification testimony was a question of fact that counsel had tried to "discredit" during cross-examination and her identification of Mullis. (Post-Conviction Tr. Vol. 2 at 26).

[39] Following the hearing, the post-conviction court issued an order denying Mullis' petition for post-conviction relief. In regard to Mullis' claims of ineffective assistance of trial counsel, the post-conviction court found that Mullis had failed to meet his burden of showing that Trial Counsel's performance was deficient and had further failed to show that he had been prejudiced.

[40] Mullis now appeals.

## Decision

[41] Mullis argues that: (1) the trial court committed fundamental error in the admission of Nienaber's testimony; (2) there is insufficient evidence to support his burglary conviction; (3) his aggregate sentence is inappropriate; and (4) the post-conviction court erred by denying his petition for post-conviction relief. We will review each argument in turn.

### 1. Direct Appeal Issue – Fundamental Error in Admission of Evidence

[42] Mullis first challenges the trial court's admission of Nienaber's trial testimony. Specifically, Mullis contends that the trial court should have excluded Nienaber's testimony under Evidence Rules 602 and 701 because Nienaber "had no personal knowledge of the alleged criminal offense" and had been "permitted to speculate as to the identity of the perpetrator" when she had been "permitted to testify" that a still photograph of the suspect in the pharmacy resembled Mullis' photograph in his Centerstone patient file. (Mullis' Br. 13-14). Mullis acknowledges that he did not object to the testimony at trial. His failure to object to the testimony results in waiver of any argument regarding its admissibility. *See Hoglund v. State*, 962 N.E.2d 1230, 1239 (Ind. 2012) ("Failure to object at trial waives the issue for review unless fundamental error occurred."), *reh'g denied*. Mullis recognizes this procedural default and argues that the admission of the testimony constituted fundamental error.[10]

[43] "[F]undamental error in the evidentiary decisions of our trial courts is especially rare." *Merritt v. State*, 99 N.E.3d 706, 709 (Ind. Ct. App. 2018), *trans. denied*. The fundamental error exception "is extremely narrow and encompasses only errors so blatant that the trial judge should have acted independently to correct the situation." *Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018) (internal quotation marks and citation omitted). "An error is fundamental, and thus reviewable on appeal, if it made a fair trial impossible or constituted a clearly

---

[10] Mullis' appellate counsel has indicated that despite Mullis' failure to object to Nienaber's testimony, "Mullis has expressly instructed [appellate] counsel to challenge the admission of Nienaber's testimony." (Mullis' Br. 14).

blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm." *Id.* (internal quotation marks and citation omitted). "Harm is not shown by the fact that the defendant was ultimately convicted; rather harm is found when error is so prejudicial as to make a fair trial impossible." *Hoglund*, 962 N.E.2d at 1239. "Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014), *reh'g denied*.

[44] Evidence Rule 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter" and that "[e]vidence to prove personal knowledge may consist of the witness's own testimony." Evidence Rule 701 provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; and (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue."

[45] Turning to Mullis' challenge to the admission of Nienaber's testimony, we conclude that Mullis has failed to meet his burden of showing fundamental error. Mullis has failed to show how the admission of Nienaber's testimony made a fair trial impossible and why the circumstances in this case were egregious. Here, Nienaber testified that she was familiar with Mullis as a

patient at Centerstone and that she had previously interacted with him while at Centerstone. Nienaber had also seen Mullis' photograph in his Centerstone patient file. Additionally, Nienaber explained how she had seen the still photographs of the suspect on social media, believed that the suspect resembled Mullis, reviewed Mullis' patient photo and his driver's license photo in his file, and then ultimately notified the police of that identification belief. Nienaber had personal knowledge of her prior interaction with Mullis, and her testimony about how she had identified Mullis as being the person in the still photograph was rationally based on her perception and was helpful to a clear understanding of her testimony and the issue of identification. Therefore, we conclude that Mullis has failed to show that the trial court committed fundamental error when it did not independently or sua sponte exclude Nienaber's testimony. *See Goodson v. State*, 747 N.E.2d 1181, 1184 (Ind. Ct. App. 2001) (holding that the trial court did not abuse its discretion in allowing lay opinion testimony of police officers, who were familiar with the defendant, to testify to the identity of the defendant in a videotape and still photographs where their testimony was helpful to the jury in determining the identity of the person depicted therein), *trans. denied*; *Gibson v. State*, 709 N.E.2d 11, 15 (Ind. Ct. App. 1999) (holding that lay opinion testimony, by a person who was not an eyewitness to the charged offenses, regarding the identification of a person depicted in a surveillance video was admissible evidence under Evidence Rule 701 as being helpful to the jury in reaching a decision about the identity of the person depicted in the surveillance video admitted as a silent witness), *trans. denied*.

## 2. Direct Appeal Issue – Sufficiency of Evidence

[46] Mullis next argues that the evidence was insufficient to support his burglary conviction only. Specifically, he "challenges the sufficiency of the evidence identifying him as the perpetrator of the burglary." (Mullis' Br. 15).

[47] "Sufficiency-of-the-evidence claims trigger a deferential standard of review in which we neither reweigh the evidence nor judge witness credibility, instead reserving those matters to the province of the jury." *Hancz-Barron v. State*, 235 N.E.3d 1237, 1244 (Ind. 2024) (cleaned up). "A conviction is supported by sufficient evidence if there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Id.* (cleaned up). "In conducting that review, we consider only the evidence that supports the jury's determination, not evidence that might undermine it." *Id.*

[48] To convict Mullis of burglary, the State was required to prove that Mullis broke and entered the building or structure of Centerstone and/or the pharmacy, with intent to commit a felony or theft therein. *See* I.C. § 35-43-2-1. Our Indiana Supreme Court has explained that "[t]he identity of an accused is a question of fact, not law." *Whitt v. State*, 499 N.E.2d 748, 750 (Ind. 1986). "Therefore, the weight to be given identification evidence, and any determination of whether it is satisfactory and trustworthy, is a function of the trier of fact." *Id.*

[49] Our review of the record reveals that the State provided sufficient evidence to support Mullis' conviction. The State's evidence showed that the pharmacy's

alarm had been triggered around 5:45 a.m. on May 31, 2022, and when the police arrived on the scene later that morning, there was damage to the outer doors of the Centerstone building and to the pharmacy's door and alarm monitor. The surveillance videos from the pharmacy showed that a male suspect, who was wearing gloves, a t-shirt, shorts, and white tennis shoes with stripes on the side, broke into the pharmacy around 5:45 a.m. The videos showed that the suspect, who remained in the pharmacy between that time and a little after 6:00 a.m., took cash from the cash register and took bottles of medication and placed them into a plastic bag. The surveillance videos from Centerstone showed that same male suspect, who was wearing a gray t-shirt, blue jean shorts, and white tennis shoes and was carrying a plastic bag, after he had exited the Centerstone building and walked in the parking lot towards a line of trees. After the police took still photographs from the surveillance videos and posted them on social media, "multiple people[,] both within law enforcement [and] also [in] the general public[,]" provided Mullis' name as the person in the photographs. (Trial Tr. Vol. 2 at 235). The State admitted these videos and still photographs of the suspect in the pharmacy for the jury to review. Additionally, Nienaber and Detective Kummer identified the suspect in the photographs and videos as being Mullis. The State's evidence also revealed that the police found a trash bag in Mullis' public dumpster at his apartment complex, and that trash bag contained a gray t-shirt, blue jean shorts, and white tennis shoes with stripes on the side, all of which were consistent with the clothing worn by the suspect from the security videos. DNA testing of the tennis shoes revealed that Mullis' DNA matched the DNA on the tennis

shoes. The trash bag also contained two appointment cards from Centerstone that had Mullis' first name of "Brent" on them as well as a prescription bottle with Mullis' mother's name on it. Furthermore, the State introduced evidence that an analysis of Mullis' cellphone revealed that, in the week leading up to the burglary, Mullis had done Google searches on how to deactivate a business alarm and on how burglars disable alarms. The analysis also revealed that, on the day of the burglary, Mullis had done Google searches on medications that were the same medications that had been stolen from the pharmacy.

[50] The evidence presented during the jury trial supports the jury's determination that Mullis perpetrated the burglary. The jury, as finder of fact, reviewed the evidence and ultimately determined that Mullis was the person depicted in the surveillance videos and still photographs as the person who had perpetrated the burglary. Mullis' argument challenging the sufficiency of the evidence is nothing more than a request to reweigh the evidence and the jury's credibility determination, which we will not do. *See Hancz-Barron v. State*, 235 N.E.3d at 1244. Accordingly, we affirm Mullis' burglary conviction.

### 3. Direct Appeal Issue – Inappropriate Sentence

[51] Mullis next argues that his aggregate sentence for his convictions and his habitual offender adjudication is inappropriate. We disagree.

[52] We may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). The defendant has the burden of persuading us that his sentence is inappropriate.

*Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). The principal role of a Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). "Appellate Rule 7(B) analysis is not to determine whether another sentence is more appropriate but rather whether the sentence imposed is inappropriate." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012) (internal quotation marks and citation omitted), *reh'g denied*.

[53] When determining whether a sentence is inappropriate, we acknowledge that the advisory sentence "is the starting point the Legislature has selected as an appropriate sentence for the crime committed." *Childress*, 848 N.E.2d at 1081. Mullis was convicted of Level 5 felony burglary, Class A misdemeanor theft, and Class B misdemeanor criminal mischief, and he was also determined to be an habitual offender. A person who commits a Level 5 felony "shall be imprisoned for a fixed term of between one (1) year and six (6) years, with the advisory sentence being three (3) years." I.C. § 35-50-2-6(b). A person who commits a Class A misdemeanor "shall be imprisoned for a fixed term of not more than one (1) year[.]" I.C. § 35-50-3-2. A person who commits a Class B misdemeanor "shall be imprisoned for a fixed term of not more than one hundred eighty (180) days[.]" I.C. § 35-50-3-3. Additionally, at the time of Mullis' offenses, the habitual offender statute provided that a trial court "shall sentence a person found to be a habitual offender to an additional fixed term

that is between . . . two (2) years and six (6) years" for a person convicted of a Level 5 felony.  I.C. § 35-50-2-8(i)(2) (2022).[11]  Here, the trial court imposed a six-year sentence for Mullis' Level 5 felony burglary conviction enhanced by six years for his habitual offender adjudication, a one-year sentence for his Class A misdemeanor theft conviction, and a 180-day sentence for his Class B misdemeanor criminal mischief conviction.  The trial court ordered for these sentences to be served concurrent to one another, resulting in an aggregate sentence of twelve (12) years.

[54]  We first turn to the nature of Mullis' offenses.  "The nature of the offense is found in the details and circumstances surrounding the offense and the defendant's participation."  *Perry v. State*, 78 N.E.3d 1, 13 (Ind. Ct. App. 2017).  Here, Mullis broke and entered the Centerstone building and the pharmacy, damaged Centerstone's and the pharmacy's property, and stole money and medications, including controlled and non-controlled substances, from the pharmacy.  The controlled substances that had been stolen included 400-500 tablets of Alprazolam or Xanax in several strengths, a bottle of Methylphenidate, and a bottle of Promethazine with Codeine.  Mullis argues that his sentence is inappropriate in light of the nature of his offenses because he did not physically harm anyone.  However, the trial court noted that Mullis had burglarized the place where he had been receiving treatment and that the

---

[11] Effective July 1, 2023, the legislature amended INDIANA CODE § 35-50-2-8(i)(2) to provide that a trial court "shall sentence a person found to be a habitual offender to an additional fixed term that is between . . . three (3) years and six (6) years" for a person convicted of a Level 5 felony.

"gratitude he gave was by busting in the doors[.]" (Trial Tr. Vol. 3 at 134). Additionally, the trial court noted that Mullis had taken medicines from the pharmacy that other patients had needed and further resulted in the pharmacy "shutting down . . .for a period of time so that persons could not get [the] assistance or help that they needed." (Trial Tr. Vol. 3 at 134).

[55] In reviewing Mullis' character, we note that "[a] defendant's life and conduct are illustrative of his or her character." *Morris v. State*, 114 N.E.3d 531, 539 (Ind. Ct. App. 2018), *trans. denied*. Mullis was forty-nine years old at the time of sentencing, and he has an extensive criminal history, including felony convictions, a misdemeanor conviction, and probation violations. Mullis has multiple prior burglary convictions and was on parole from two burglary convictions when he committed the burglary, theft, and criminal mischief offenses in this case. Mullis' felony convictions include five burglary convictions and a theft conviction with executed time served in the DOC. Mullis also has a felony conviction for escape after he had escaped from the DOC, stole a truck, and fled to Georgia. Additionally, Mullis has a lengthy juvenile history that spanned from age seven to age sixteen when he had been waived to adult court. Mullis points to the sixteen-year period prior to his current offenses and suggests that this period reflects a positive view of his character because he did not have any criminal offenses or convictions during that time period. However, he fails to acknowledge that this lapse in criminal activity occurred because he was incarcerated in the DOC during that period for two felony burglary convictions and an habitual offender adjudication. The PSI

also reveals that Mullis had started using methamphetamine when he was eighteen years old and had used it until the time of his arrest in 2022. Additionally, Mullis' outbursts and behavior toward the trial court at the end of trial and during the sentencing hearing reveal Mullis' poor character and his disrespect and disdain for the judicial system and law enforcement.

[56] Mullis has not persuaded us that his aggregate sentence for his burglary, theft, and criminal mischief convictions and his habitual offender adjudication is inappropriate. Therefore, we affirm the sentence imposed by the trial court.

## 4. Post-Conviction Issue – Ineffective Assistance of Trial Counsel

[57] As part of Mullis' appeal of the post-conviction court's order, he contends that the post-conviction court erred by denying him relief on his claim of ineffective assistance of trial counsel. We disagree.

[58] "[P]ost-conviction proceedings do not grant a petitioner a 'super-appeal' but are limited to those issues available under the Indiana Post-Conviction Rules." *Shepherd v. State*, 924 N.E.2d 1274, 1280 (Ind. Ct. App. 2010), *trans. denied*. "In post-conviction proceedings, the petitioner bears the burden of establishing his claims by a preponderance of the evidence." *Isom v. State*, 170 N.E.3d 623, 632 (Ind. 2021), *reh'g denied*. "Where, as here, the petitioner is appealing from a negative judgment denying post-conviction relief, he must establish that the evidence, as a whole, unmistakably and unerringly points to a conclusion contrary to the post-conviction court's decision." *Id.* (internal quotation marks and citation omitted).

[59] Before we address Mullis' argument, we note that the judge who presided over Mullis' jury trial is also the judge who presided over the post-conviction proceedings. "[I]n such a case, the judge is uniquely situated to assess whether trial counsel's performance fell below an objective standard of reasonableness and whether, but for counsel's unprofessional conduct, there was a reasonable probability that a different verdict would have been reached." *Hinesley v. State*, 999 N.E.2d 975, 982 (Ind. Ct. App. 2013), *reh'g denied*, *trans. denied*. Accordingly, the post-conviction court's findings and judgment are "entitled to 'greater than usual deference.'" *Id.* (quoting *McCullough v. State*, 973 N.E.2d 62, 75 (Ind. Ct. App. 2012), *trans. denied*). *See also State v. Dye*, 784 N.E.2d 469, 476 (Ind. 2003) (noting that because the same judge presided at both the original trial and post-conviction hearing, the judge was in "an exceptional position" to assess weight and credibility of the factual evidence and whether the defendant was deprived of a fair trial).

[60] A claim of ineffective assistance of trial counsel requires a petitioner to show that: (1) counsel's performance was deficient by falling below an objective standard of reasonableness based on prevailing professional norms; and (2) counsel's performance prejudiced the defendant such that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Davidson v. State*, 763 N.E.2d 441, 444 (Ind. 2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984), *reh'g denied*), *reh'g denied*, *cert. denied*. "A reasonable probability arises when there is a 'probability sufficient to undermine confidence in the outcome.'" *Grinstead v.*

*State*, 845 N.E.2d 1027, 1031 (Ind. 2006) (quoting *Strickland*, 466 U.S. at 694). "Failure to satisfy either of the two prongs will cause the claim to fail." *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002). "Indeed, most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone." *Id.* Therefore, if we can dismiss an ineffective assistance claim on the prejudice prong, we need not address whether counsel's performance was deficient. *Henley v. State*, 881 N.E.2d 639, 645 (Ind. 2008).

[61] A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Morgan v. State*, 755 N.E.2d 1070, 1072 (Ind. 2001). Counsel's performance is presumed effective, and a petitioner must offer strong and convincing evidence to overcome this presumption. *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002). "Isolated poor strategy or bad tactics do not necessarily amount to ineffective assistance of counsel." *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998). "Reasonable strategy is not subject to judicial second guesses." *Ingalls v. State*, 187 N.E.3d 233, 247 (Ind. Ct. App. 2022) (internal quotation marks and citation omitted), *trans. denied*. "This Court will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener*, 696 N.E.2d at 42.

[62] We now turn to Mullis' arguments regarding ineffective assistance of trial counsel. Mullis argues that Trial Counsel rendered ineffective assistance by

failing to object to the admission of: (1) the surveillance videos; (2) the clothing and shoes found in Mullis' communal dumpster; and (3) Nienaber's testimony.[12]

[63] To demonstrate ineffective assistance of trial counsel for failure to object, a petitioner must prove that an objection would have been sustained if made. *Benefield v. State*, 945 N.E.2d 791, 799 (Ind. Ct. App. 2011). Additionally, the petitioner must show that he was prejudiced by counsel's failure to make an objection. *Kubsch v. State*, 934 N.E.2d 1138, 1150 (Ind. 2010), *reh'g denied*.

[64] Mullis first argues that Trial Counsel should have objected to the admission of the surveillance videos based on a lack of foundation for admission under the silent witness theory. "The silent witness theory is an application of Evidence Rule 901." *Kirby v. State*, 217 N.E.3d 575, 584 (Ind. Ct. App. 2023), *trans. denied*. Indiana Evidence Rule 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Our Court has explained that "[p]hotographs and videos can be authenticated through either a witness's testimony *or*, in instances

---

[12] When arguing that Trial Counsel "failed to oppose admission" of the surveillance videos and the clothing by objecting at trial, Mullis also makes a passing assertion that Trial Counsel also should have filed a motion in limine regarding videos and clothing. (Mullis' Br. 20, 22). Mullis makes no cogent argument nor provides any relevant caselaw regarding such a pretrial motion; therefore, we conclude that he has waived any such argument. *See* Ind. App. Rule 46(A)(8)(a). *See also Griffith v. State*, 59 N.E.3d 947, 958 n.5 (Ind. 2016) (noting that the defendant had waived his arguments by failing to provide cogent argument).

in which no witness observed what a photograph or video portrays, the silent-witness theory." *McFall v. State*, 71 N.E.3d 383, 388 (Ind. Ct. App. 2017) (citing 13 Robert L. Miller, Jr., *Indiana Practice Series: Evidence* § 901.209 (4th ed. 2016)) (emphasis added).

[65] The silent witness theory permits the admission of surveillance footage as substantive rather than demonstrative evidence. *McCallister v. State*, 91 N.E.3d 554, 561 (Ind. 2018). When surveillance videos and photographs are admitted as substantive evidence, they serve "as silent witness[es] as to what activity is being depicted." *Knapp v. State*, 9 N.E.3d 1274, 1282 (Ind. 2014) (internal quotation marks and citation omitted), *cert denied*. For evidence to be admitted as substantive evidence under the silent witness theory, "there must be a strong showing of authenticity and competency, including proof that the evidence was not altered." *McCallister*, 91 N.E.3d at 561-62. *See also Knapp*, 9 N.E.3d at 1282 (explaining that the foundation for the admission of silent witness photographs and surveillance videos requires "identifying testimony of the scene" of the photographs and surveillance videos "sufficient to persuade the trial court . . . of their competency and authenticity to a *relative certainty*") (emphasis in original). "In order to authenticate videos or photographs using the silent-witness theory, there must be evidence describing the process or system that produced the videos or photographs and showing that the process or system produced an accurate result." *McFall v. State*, 71 N.E.3d 383, 388 (Ind. Ct. App. 2017) (citing Evid. R. 901(b)(9)). "Surveillance video footage may be properly authenticated and admissible under the silent-witness theory when the

proponent presents testimony from someone with knowledge on the security system that produced the video or image, on the integrity of the system's process, and on whether [the] video or image was altered." *Irwin v. State*, 229 N.E.3d 567, 571 (Ind. Ct. App. 2024) (internal quotation marks and citation omitted), *trans. denied*.

[66] During the post-conviction hearing, Mullis asked Trial Counsel why he had not objected to the admission of the surveillance videos, and Trial Counsel testified that he had not objected because "a sufficient foundation" for the videos had been laid. (Post-Conviction Tr. Vol. 2 at 23, 31, 41, 44). Trial Counsel specifically explained that the two witnesses, who represented Centerstone and the pharmacy, had provided the necessary foundation for the admission of the videos. "Few points of law are as clearly established as the principle that [t]actical or strategic decisions will not support a claim of ineffective assistance." *McCary v. State*, 761 N.E.2d 389, 392 (Ind. 2002) (internal quotation marks and citation omitted), *reh'g denied*. Moreover, as the post-conviction court concluded, the State properly laid the foundation for the surveillance videos from Centerstone and the pharmacy through Brown's and Knapp's testimonies regarding the surveillance videos.

[67] Because Mullis has failed to demonstrate that a foundation objection would have been sustained, he has failed to show that Trial Counsel rendered deficient performance. *See Benefield*, 945 N.E.2d at 799 (explaining that to demonstrate ineffective assistance of trial counsel for failure to object, a petitioner must

prove that an objection would have been sustained if made). Accordingly, we affirm the post-conviction court's denial of post-conviction relief on this claim.[13]

[68] Mullis next argues that Trial Counsel rendered ineffective assistance because he failed to object to the admission of the clothing and shoes found in Mullis' communal dumpster based on relevancy under Evidence Rule 401 and prejudice under Evidence Rule 403. Specifically, Mullis contends that Trial Counsel should have objected that the clothing and shoes were not relevant and that these items were "unduly prejudicial to Mullis as it allowed the . . . State's witnesses to speculate that the clothing items located in the dumpster with Mullis' DNA on them looked like clothing items in a surveillance video." (Mullis' Br. 22).

[69] Although Mullis raised an ineffective assistance of counsel claim in his post-conviction petition regarding counsel's failure to object to the clothing and shoes, that claim was not based on a failure to raise a relevancy or prejudice argument. Because Mullis' appellate argument on this claim is different from his claim raised in his post-conviction petition, we conclude that he cannot raise it for the first time on appeal. *See Isom*, 170 N.E.3d at 636 (explaining that a petitioner could not raise an appellate argument on an ineffective assistance of

---

[13] Mullis' appellate counsel also asserts that Mullis has "directed" appellate counsel to cite to *Bergner v. State*, 397 N.E.2d 1012 (Ind. Ct. App. 1979) and to argue that a trial court must hold a pretrial proceeding in order to have the State establish the foundation under the silent witness theory. (Mullis' Br. 21). We have set out above the relevant foundation that is required for the State to admit surveillance videos under the silent witness theory, and we reject Mullis' argument.

counsel claim that was different from the ineffective assistance of counsel basis raised in his post-conviction petition). *See also* Ind. Post-Conviction Rule 1(8). Accordingly, we affirm the post-conviction court's denial of post-conviction relief on this claim.[14]

[70] Lastly, Mullis argues that Counsel rendered ineffective assistance because he failed to object to the admission of Nienaber's testimony based on Evidence Rules 602 and 701. We have already addressed the admissibility of Nienaber's testimony under these evidentiary rules when we addressed Mullis' fundamental error argument above and concluded that there was no fundamental error in the admission of her testimony. Accordingly, we rely on our previous analysis and, for those same reasons, conclude that Mullis has failed to show that an objection to Nienaber's testimony based on those evidentiary rules would have been sustained. Accordingly, Mullis has failed to

---

[14] Even if Mullis had raised these specific objection bases in his petition, he has still failed to show that he was entitled to post-conviction relief on this ineffective assistance of counsel claim because he has failed to show that such relevancy and prejudice objections would have been sustained. The clothing and shoes found in the trash bag in the communal dumpster were consistent with the clothing and shoes worn by the suspect in the surveillance videos and were relevant and probative to the issue of whether Mullis was the suspect in the videos. "The identity of an accused is a question of fact, not law[,]" and "the weight to be given identification evidence . . . is a function of the trier of fact." *Whitt*, 499 N.E.2d at 750. All relevant evidence is necessarily prejudicial in a criminal prosecution. *Wages v. State*, 863 N.E.2d 408, 412 (Ind. Ct. App. 2007), *reh'g denied*, *trans. denied*. However, "[t]he danger of *unfair* prejudicial impact arises from the potential for a jury to substantially overestimate the value of the evidence, or its potential to arouse or inflame the passions or sympathies of the jury." *Id.* (emphasis added). Mullis has not shown that the jury substantially overestimated the value of the evidence or that the evidence aroused or inflamed the passions of the jury. Because Mullis has failed to show that an objection based on relevancy or prejudice would have been sustained, he has failed to show that Trial Counsel rendered deficient performance. *See Benefield*, 945 N.E.2d at 799 (explaining that to demonstrate ineffective assistance of trial counsel for failure to object, a petitioner must prove that an objection would have been sustained if made).

show that Trial Counsel rendered ineffective assistance of counsel, and we affirm the post-conviction court's denial of relief on this claim.

[71] Affirmed.

May, J., and Brown, J., concur.

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Kathy Bradley
Deputy Attorney General
Indianapolis, Indiana